**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                )
ANITA BOONE,                    )
                                )
         Plaintiff,             )
                                )
         v.                     )     Civil Action No. 05-346 (RWR)
                                )
HILLARY CLINTON,                )
                                )
         Defendant.             )
_____)
```

<u>MEMORANDUM OPINION AND ORDER</u>

The plaintiff, Anita Boone, has sued the Secretary of State[1] under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA") alleging that the State Department discriminated against her because of her age, race, and sex by refusing to promote her on two occasions.  The Department moves for summary judgment, contending that Boone failed to exhaust her administrative remedies and that she has not rebutted the legitimate, nondiscriminatory reasons offered by the Department for its actions.  Because Boone successfully exhausted her administrative remedies and has sufficiently rebutted the Department's legitimate, nondiscriminatory reasons for her race discrimination claim with respect to the first

---

[1] Hillary Clinton is substituted for Condoleeza Rice under Fed. R. Civ. P. 25(d).

- 2 -

promotion opportunity only, the Department's motion for summary judgment will be granted in part and denied in part.[2]

BACKGROUND

Boone, a black female over age forty, is employed as an Information Analyst at the State Department's Office of Information Resources Programs and Services ("IPS"). (Def.'s Stmt. of Material Facts ("Def.'s Stmt.") ¶ 1; Compl. ¶ 6.) Her position involves working with other offices in response to Freedom of Information Act ("FOI" or "FOIA") and Privacy Act requests; performing classification review and records management, including using the Freedom of Information Document Management System ("FREEDOMS"); conducting briefings for officers traveling overseas; and occasionally serving for short periods as acting branch chief. (Def.'s Stmt. ¶ 3; Pl.'s Stmt. of Material Facts ("Pl.'s Stmt.") ¶ 63; Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. ("Pl.'s Mem."), Ex. 5 at 0330.) She has held this position since 1997 and has been promoted from GS-11 to GS-12. (Compl. ¶ 6; Pl.'s Mem. ¶ 63.) At the relevant times, Boone's supervisor was John Cruce, a Branch Chief (Def.'s Stmt. ¶ 2), and she received positive work reviews from 1997 through 2002. (Pl.'s Stmt. ¶ 64.)

---

[2] Boone does not defend her hostile work environment claim, Count 3. (Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. ("Pl.'s Mem.") at 43 n.6.) It will be dismissed.

- 3 -

In response to Vacancy Announcement A/EX-02-060 ("Vacancy 02-060") for multiple Program Analyst positions, Boone applied for a grade level 13 position.  (Def.'s Stmt. ¶¶ 4, 12.)  The announcement stated that applicants should have the following knowledge, skills, and abilities ("KSAs"):

> (1) ability to communicate orally in performing program analysis work; (2) knowledge of regulations and policies governing FOIA, Privacy Act, and Executive Order 12958; (3) ability to communicate in writing in program analysis work; (4) knowledge of principles and practices of program evaluation and oversight; and (5) ability to perform in-depth legal research.

(Id. ¶ 5.)  A selection panel was formed to make hiring recommendations and included the following eight Branch Chiefs: Marria Braden, John Cruce, Frank Foldvary, Audree Holton, Patricia Magin, Alice Ritchie, Patrick Scholl, and Tasha Thian. (Id. ¶ 7.)  The panel received a certificate from a human resources officer with thirty-two unranked candidates, including Boone.  (Id. ¶ 11.)  The panel created a process to rank the applicants based on the KSAs.[3]  Following the panel's evaluation, Boone had an aggregate score of 157, which tied for the second highest score.  (Id. ¶ 20; Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem."), Ex. 2 at 0238.)  When

_____

[3] The Department asserts that there were five KSAs, which the hiring announcement reflects.  (Def.'s Stmt. ¶ 5.)  However, the evaluation sheet, as the plaintiff contends, appears to reflect that "performance" was also considered in addition to the five KSA categories.  (See Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J., Ex. 2 at 0237; Pl.'s Mem., Ex. 9.)

assigning scores, the panel assumed that the applications were accurate and scored the candidates based solely on the information stated in their applications.  (Def.'s Stmt. ¶ 18.) Although the panel did not interview the candidates, it did meet to discuss them.  The panel looked for candidates who would be capable of becoming future Branch Chiefs (id. ¶ 26), and it considered management potential, expertise in the field, communication skills, and leadership skills as well.  (Def.'s Mem., Ex. 2 at 0235.)  Panel members Scholl, Ritchie, and Braden expressed concerns with Boone's FOI, FREEDOMS, geography, communication and leadership skills based on their experiences with and observations of her.  (Def.'s Stmt. ¶¶ 33-38.)  Cruce, on the other hand, highly recommended Boone for the promotion. (Id. ¶ 39.)  The panel recommended for promotion any candidate who received a majority vote of the panel members.  (Id. ¶ 42.) The panel recommended seven candidates (id. ¶ 43), including Margaret Scholl, the wife of panel member Patrick Scholl.  (Id. ¶ 30.)  Six were actually promoted,[4] as Margaret Scholl was later deemed ineligible for a promotion.  (Id. ¶ 46; Pl.'s Stmt ¶ 43.) The panel did not recommend Boone, who received four votes, and she did not receive a promotion.  (Def.'s Stmt. ¶¶ 47, 52.) Boone received official notice that she was not selected on

_____

[4] Candidates Hartman, Pace, Dubose, Chichester, Glenn, and Sawka were promoted.  (Def.'s Mem. at 10 n.8.)

- 5 -

August 2, 2002.  (Id. ¶ 52.)  On July 25, 2002, before receiving official notice, Boone sent an email to Arlene Brandon, an "EEO/ADR Specialist" in the Office of Civil Rights, stating her wish to file an equal employment opportunity ("EEO") complaint because her non-selection was discriminatory.  (Pl.'s Mem., Ex. 12 at 0157.)  Brandon initially assigned Gwen Strogen-Boozer as Boone's EEO counselor on August 1, 2002.  (Id. at 0160.)  After an initial meeting, Boone requested a different counselor on August 2, 2002.  (Id. at 0161.[5])  Boone had contact with Leroy Potts, another EEO counselor to whom she was not assigned, and Boone's attorney sent Potts a letter indicating her intent to file a complaint and the nature of the complaint.  (Id. at 0163.) Brandon ultimately assigned as Boone's EEO counselor Diane Ferguson, with whom Boone had her initial contact on October 9, 2002.  (Def.'s Mem., Ex. 4, Dep. of Anita Boone at 116.)

Later, Boone applied again for a promotion under Vacancy Announcement A/EX-02-085 ("Vacancy 02-085").  The panel received a certificate ranking twenty-one eligible applicants, including Boone.  (Def.'s Stmt. ¶¶ 56-57.)  Boone ranked fifth on the list, tied with two other applicants for the third highest score. Human resources instructed the panel to follow the "Rule-of-Three."  (Id. ¶ 58.)  Under the rule, the selection officials are

---

[5] This page number, missing from the document, is supplied by the Court.

- 6 -

to "[c]onsider only the first three applicants on the certificates.  If an applicant declines, then [the selection officials] may consider the next candidate on the list."  (Def.'s Mem., Ex. 2 at 0514.)  The panel recommended the first two candidates on the ranked list for promotion; it did not select Boone.  (Def.'s Stmt. ¶ 61.)

    Counts 1, 2, and 4 of Boone's complaint allege, respectively, race discrimination, gender discrimination, and disparate treatment race and gender discrimination, all in violation of Title VII.  Count 5 alleges age discrimination in violation of the ADEA.  The Department moves for summary judgment on Boone's race, gender, and age discrimination claims in Counts 1, 2, 4, and 5, contending that Boone failed to exhaust her administrative remedies with regard to Vacancy 02-060 and that she has not rebutted the Department's legitimate, nondiscriminatory reasons offered for its actions.  The Department also seeks dismissal of Counts 1, 2, and 5, each of which alleges "a policy and practice of discrimination," by arguing that pattern and practice claims cannot be brought by an individual plaintiff.  Boone opposes summary judgment on those counts, arguing that there are disputed material facts bearing on whether the Department discriminated against her by refusing to promote her on two occasions.  Boone also argues that she has not asserted any pattern or practice claim.

## DISCUSSION

On a motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Summary judgment may be granted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see also Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009). A material fact is one that is capable of affecting the outcome of the litigation. Liberty Lobby, Inc., 477 U.S. at 248. A genuine issue is one where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," id., as opposed to evidence that "is so one-sided that one party must prevail as a matter of law." Id. at 252. A court considering a motion for summary judgment must draw all "justifiable inferences" from the evidence in favor of the nonmovant. Id. at 255. The nonmoving party, however, must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

- 8 -

Rather, the nonmovant must "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587 (emphasis omitted) (citing Fed. R. Civ. P. 56(e)).  In the end, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

I.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

    Before filing a lawsuit, "[a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1).  The Department asserts that Boone did not contact an EEO counselor within forty-five days following her non-selection for Vacancy 02-060.  (Def.'s Mem. at 14-15.)  Boone officially learned of her nonselection for Vacancy 02-060 on or about August 2, 2002, but did not officially begin to receive counseling until October 9, 2002.  Boone asserts that the EEO process began when she contacted the Office of Civil Rights on July 25, 2002, noted her intent to file an EEO complaint, and requested an appointment with a counselor.  (Pl.'s Mem. at 28.)

- 9 -

The regulation does not facially require that a plaintiff meet with a counselor within forty-five days, but instead states that a complainant must initiate contact within that time.  The EEOC has interpreted "initiate contact" to require that "an employee who believes that she has been the subject of discrimination must timely (1) contact an agency official 'logically connected' with the EEO process (not necessarily a Counselor) and (2) demonstrate an intent to begin the EEO process."  Klugel v. Small, 519 F. Supp. 2d 66, 71 (D.D.C. 2007) (noting that the D.C. Circuit has not yet addressed the meaning of the phrase "initiate contact").  See also Lane v. Tschetter, Civil Action No. 05-1414 (EGS), 2007 WL 2007493, at *3 (D.D.C. Jan. 15, 2007) (applying the EEOC's definition of "initiate contact" to find that plaintiff's letter to the official responsible for EEO functions had not begun the EEO process because it did not express an intent to begin the EEO process or include sufficient facts of alleged discrimination).  Within the forty-five day window, Boone contacted Brandon, the EEO/ADR Specialist, had an initial conversation with EEO counselor Strogen-Boozer, and sent through her attorney a letter to EEO counselor Potts discussing her intent to file a complaint and the nature of her complaint.  (See Pl.'s Mem. at 28-29; Ex. 12 at 0157-0158, 0160, 0161, 0170-0171.)  The Department did not contest Boone's assertions that she contacted Brandon, Strogen-

- 10 -

Boozer, or Potts, nor did it argue that these contacts were unconnected with the EEO process.  (See Def.'s Mem. at 14-15.) Under the EEOC's interpretation, Boone initiated contact with a counselor within the forty-five day period required by § 1614.105(a)(1).

## II. DISCRIMINATION CLAIMS

A plaintiff bringing discrimination claims under Title VII or the ADEA without direct evidence may employ the burden-shifting framework approved in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973), when the defendant denies that its actions were motivated by the plaintiff's race, sex, or age.  Carmona v. Snow, Civil Action No. 05-1194 (JGP), 2007 WL 915220, at *5 (D.D.C. Mar. 26, 2007) (noting that ADEA claims are analyzed under the McDonnell Douglas framework as Title VII claims are).  Under McDonnell Douglas, Boone would be required to show that: 1) she is a member of a protected class; 2) she applied for and was qualified for the available position; 3) despite her qualifications, she was rejected; and 4) either someone filled the position or it remained vacant and the employer continued to seek applicants.  Peterson v. Hantman, Civil Action No. 02-2552 (RWR), 2006 WL 1442662, at *3 (D.D.C. May 25, 2006).  However, the D.C. Circuit has clarified that the prima facie factors are "largely [an] unnecessary sideshow" and concluded that

- 11 -

> [i]n a Title VII disparate-treatment suit where an
> employee has suffered an adverse employment action and
> an employer has asserted a legitimate,
> non-discriminatory reason for the decision, the
> district court need not - *and should not* - decide
> whether the plaintiff actually made out a prima facie
> case under *McDonnell Douglas*.  Rather, in considering
> an employer's motion for summary judgment or judgment
> as a matter of law in those circumstances, the district
> court must resolve one central question: Has the
> employee produced sufficient evidence for a reasonable
> jury to find that the employer's asserted
> non-discriminatory reason was not the actual reason and
> that the employer intentionally discriminated against
> the employee on the basis of race, color, religion,
> sex, or national origin?

Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir.

2008).  The condensed inquiry does not alter the plaintiff's

burden.  "The ultimate burden of persuading the trier of fact

that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff."  Texas Dept.

Of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  A court

looks to whether a reasonable jury could infer intentional

discrimination from all of the evidence including: 1) the

plaintiff's prima facie case, 2) evidence presented to attack the

employer's proffered explanation for its actions, and 3) further

evidence of discrimination such as evidence of discriminatory

statements or attitudes by the employer.  Carter v. George

Washington Univ., 387 F.3d 872, 878 (D.C. Cir. 2004).

   "Pretext may be established 'directly by persuading the

court that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence.'"  Sewell v. Chao, 532 F.
Supp. 2d 126, 138 (D.D.C. 2008) (citing Burdine, 450 U.S. at
256).  However, it is insufficient to simply show "that a reason
given for a job action is not just, or fair, or sensible";
instead the plaintiff must establish "that the explanation given
is a phony reason."  Id. at 138 (stating that once a legitimate
reason has been given, "the issue is not the correctness or
desirability of [the] reasons offered . . . [but] whether the
employer honestly believes in the reasons it offers" (alterations
in original) (quoting Fischbach v. D.C. Dep't of Corr., 86 F.3d
1180, 1183 (D.C. Cir. 1996))); see also St. Mary's Honor Ctr. v.
Hicks, 509 U.S. 502, 511 (1993) (reasoning that a "rejection of
the defendant's proffered reasons" would not, by itself, compel
judgment for the plaintiff because "the Title VII plaintiff at
all times bears the 'ultimate burden of persuasion'" (citations
omitted)).  A plaintiff can attack an employer's qualification-
based explanation by comparing her qualifications to those of
successful applicants or by exposing flaws in the employer's
explanation.  Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir.
2006).  "Title VII liability cannot rest solely upon a judge's
determination that an employer misjudged the relative
qualifications of admittedly qualified candidates[,]" however.
Id. (internal citation and quotation omitted).  To show pretext,
a plaintiff "must show 'both that the reason was false, and that

discrimination . . . was the real reason.'"   <u>Weber v. Battista</u>,
494 F.3d 179, 186 (D.C. Cir. 2007) (quoting <u>Hicks</u>, 509 U.S. at
515).

A.   <u>Vacancy 02-060</u>

1.   Legitimate, nondiscriminatory reasons

The Department contends that despite Boone's high aggregate
score, she was not selected to fill Vacancy 02-060 because panel
members had concerns regarding her leadership and communication
skills.  In particular, Ritchie had worked with Boone on several
projects and found that Boone had "difficulty communicating and
conveying her thoughts into words," had not shown solid geography
skills, and had not been thorough in documenting FREEDOMS
entries.  (Def.'s Mem., Ex. 1 at 0223-24; Ex. 2 at 0226.)  Other
panel members, such as Scholl and Braden, also noted a concern
with Boone's communication and leadership skills and declined to
vote for her.  (<u>See</u> <u>id.</u>, Ex. 2 at 0233 (contending that as
Boone's former supervisor, Scholl believed that Boone could not
grasp the details of the job and did not stay on top of her
cases); <u>id.</u> at 0243 (stating Braden's belief that Boone needed to
"enhance leadership and communication skills" and had not taken
recent training to enhance her skills).)

2.   Pretext

Boone presents statistical evidence to demonstrate that the
defendant's stated reasons for her non-selection were pretext.

"[E]vidence of systemic disparate treatment is relevant to and probative of the issue of pretext even when it is insufficient to support a pattern and practice disparate treatment case." Bell v. Envtl. Prot. Agency, 232 F.3d 546, 553 (7th Cir. 2000).  While statistical evidence is "'less significant'" in an individual disparate treatment case where "'the ultimate issue is whether the *particular* plaintiff was the victim of an illegitimately motivated employment decision,'" Horvath v. Thompson, 329 F. Supp. 2d 1, 10 (D.D.C. 2004) (quoting Krodel v. Young, 748 F.2d 701, 710 (D.C. Cir. 1984)), such evidence may still be probative of an employer's motive in making selection decisions "and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue." Cooper v. Southern Co., 260 F. Supp. 2d 1258, 1267 (N.D. Ga. 2003). Thus, in an individual disparate treatment case, statistical evidence is "admissible and may be helpful, though ordinarily not dispositive." Krodel, 748 F.2d at 710.

Boone alleges that despite the high percentage of people of color in this workplace in 2002, the number of black versus white employees in each of three pay grades in the Information Response Branch was as follows:

|       | GS-13 | GS-14 | GS-15 |
|-------|-------|-------|-------|
| Black | 7     | 4     | 0     |
| White | 6     | 177   | 38    |

- 15 -

(Pl.'s Stmt. ¶ 84.)  While the low percentage of black GS-13s, GS-14s, and GS-15s in the Information Response Branch may alone be insufficient to raise an inference of discrimination, see Whitener v. England, Civil Action No. 04-273 (LFO), 2006 WL 3755220, at *7 (D.D.C. Dec. 19, 2006) (finding that merely noting the composition of a workforce, without more, did not sustain an individual discrimination action), the unrebutted evidence[6] of a significant disparity between the racial composition of the pool of qualified candidates for the vacancy and the racial composition of the selectees can reasonably suggest pretext. Thirty-two individuals applied for the vacancy, and, in an initial evaluation, Cruce and another GS-13 Program Analyst certified every one of the applicants as meeting the minimum qualifications for the announcement.  (Pl.'s Mem. at 18.)  Eight of these candidates were white, two were Hispanic, and twenty-two were black.  (Id.)  However, of the seven candidates selected by the panel, five were white and only two were black.  (Id. at 39-40.)  That the selecting officials promoted more than seventy percent of the white applicants deemed minimally qualified but fewer than ten percent of black applicants deemed minimally qualified can support Boone's allegation that her non-selection

---

[6] The defendant did not file a reply.

- 16 -

was motivated by her race.[7]  While the analysis here might be different if this statistical evidence were all that Boone presented to survive the Department's motion for summary judgment, see Krodel, 748 F.2d at 710, Boone presents additional evidence from which a trier of fact could reasonably conclude that race motivated her non-selection.

Boone argues that she was more qualified than some of the white applicants who were promoted.  According to Boone, Glenn lacked FOIA, Privacy Act, and litigation experience, had been at the Department for only two months, and scored lower than Boone in the panel's ranking.  (Pl.'s Mem. at 39.)  In comparison to her bachelor's degree and five years of FOI experience, Boone contends that Sawka's two years of FOI experience and an associate's degree do not measure up.

Ordinarily, to allow a jury to infer discrimination, "the qualifications gap [between the plaintiff and the selectee] must be great enough to be inherently indicative of discrimination" because in a close case, a reasonable juror might usually assume that the employer is better able to make an assessment or make a

---

[7] Because Boone does not argue that the promotions were statistically skewed based on age or gender, the statistics do not create a genuine issue of material fact for trial on her gender discrimination and ADEA claims.  Unbuttressed by statistical support reflecting gender or age discrimination, the additional evidence discussed below does not alone suffice to fill the gap.  Thus, the Department's motion for summary judgment will be granted with respect to those claims.

judgment call.  Holcomb, 433 F.3d at 897.  The panel permissibly considered what it believed to be relevant factors when evaluating candidates in addition to the candidates' scores, including expertise, management skills, and leadership skills.[8] (See Def.'s Mem., Ex. 2 at 0235.)  Absent any other evidence, the differences in education scores and FOI experience to which Boone points might not reflect the wide gulf in qualifications typically necessary to support an inference of unlawful discrimination.  See, e.g., Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1295, 1299 (D.C. Cir. 1998) (comparing nineteen years of relevant experience and a master's degree with two months of relevant experience and no college degree); Lathram v. Snow, 336 F.3d 1085, 1092 (D.C. Cir. 2003) (comparing three years of

---

[8] Glenn's application reflects that he had worked previously with the Presidential Recordings and Materials Preservation Act and its "restriction categories . . . closely mirror those of FOIA and the Privacy Act."  (Pl.'s Mem., Ex. 6 at 0448.) Additionally, Glenn had attended several FOI and Privacy Act training sessions and had experience with Executive Order 12958, which was a skill relevant to the program analyst position. (Id.)  In considering Glenn's candidacy, panel members expressed belief that his prior experiences at the National Archives and Records Administration and the Office of the Historian would be beneficial to the Department and reflected strong expertise in records and information management.  (Def.'s Mem., Ex. 2 at 0226, 0244.)

Regarding Sawka, Ritchie believed that Sawka was a "good risk" who was knowledgeable on all aspects of IPS and thorough in her FREEDOMS entries.  (Def.'s Mem., Ex. 2 at 0226.)  Magin believed that Sawka had been involved in complex cases, had good research skills, demonstrated leadership skills through her participation in working groups, and had desirable experiences from a prior job.  (Id. at 0232.)

experience in public affairs, strong evaluations from former
supervisors, and expertise in drug interdiction issues with no
experience in public affairs and relevant experience limited to
editing a small drug enforcement newsletter).  However, neither
Aka nor Lathram involved statistical evidence as additional proof
of pretext.  Here, in the context of the wide statistical
discrepancy between the number of qualified black applicants and
the number of black selectees, even the less stark differences in
qualifications Boone presents could lend support to a reasonable
inference of a discriminatory motive.  See Liberty Lobby, Inc.,
477 U.S. at 248.

In attempting to show animus, Boone also argues that Ritchie
unfairly based her opinion of Boone's FOI skills on a brief
interaction they had fifteen years earlier in 1987.  Evidence
that "an employer misjudged an employee's performance or
qualifications is, of course, relevant to the question whether
its stated reason is a pretext masking prohibited
discrimination."  Fischbach, 86 F.3d at 1183.  Ritchie based her
opinion largely on her claim that Boone said in 1987 that she
"didn't feel [that] she could do the [FOI] work."  (Pl.'s Mem. at
36; Ex. 8 ("Ritchie Dep.") at 93.)  A defendant's failure to
consider a plaintiff's more recent, improved performance might
not indicate "an illegal discriminatory intent . . . as [s]he
could have relied solely on the plaintiff's uncontested past

performance problems." <u>Vasilevsky v. Reno</u>, 31 F. Supp. 2d 143, 151 (D.D.C. 1998) (involving problems four and five years prior). However, Boone has not left Ritchie's opinion uncontested (Pl.'s Mem. at 35-36), and a reasonable inference of bias could easily be drawn from Ritchie's refusal to leaven her opinion about Boone's FOI skills given that Cruce, the person who was most familiar with Boone's recent work, aggressively supported her promotion in discussions with the other selecting officials. (Pl.'s Mem., Ex. 4 at 0254-0255.)  Moreover, a reasonable jury could find that the Department's use of Ritchie's explanation is pretextual since the Department assigned Boone soon after the promotions were announced to train Glenn in FOI and the Privacy Act.  (See <u>id.</u> at 0003.)

Additionally, Magin asserted that Patrick Scholl was Boone's former supervisor and he criticized Boone's performance during selection panel discussions.  (Def.'s Mem., Ex. 2 at 0232-0233.) However, Boone insists, without challenge, that she never worked with Patrick Scholl.[9]  (<u>See</u> Pl.'s Stmt. ¶ 37.)  This raises a factual issue about whether the selecting officials, who relied on Boone's lack of qualifications to justify their decision not to promote her, did not accurately characterize Boone's past work

_____

[9] Boone also contests that she previously worked with Braden.  (Pl.'s Stmt. ¶ 38.)  However, Braden did not state that they had worked together.  Braden based her assessment in part on her "experiences with [Boone]" (Def.'s Mem., Ex. 2 at 0243), which could reflect interactions other than those as co-workers.

- 20 -

experience.  It also could undermine the credibility of their
neutral justification for not promoting Boone and could help
raise the specter that it was pretextual.  Reasonable inferences
could easily be drawn that the justification partly masked, at
best, a bias favoring the candidate married to a panel member
whose criticisms were aimed at weakening his wife's competitor's
chances, or, at worst, racial animus.  A reasonable jury could
conclude, from all of the statistical and other evidence Boone
offers, that the Department's explanation for her non-selection
was a mere pretext for race discrimination.

    B.   Vacancy 02-085

        1.   Legitimate, nondiscriminatory reasons

    For Vacancy 02-085, the Department states that the panel did
not select Boone because it followed OPM's rule of three.
According to OPM's hiring instructions, the rule of three
requires consideration of the first three applicants on the
certificate, and then if one of the candidates declines, the next
candidate can be considered.  (Def.'s Mem., Ex. 2 at 0514.)
Unlike with Vacancy 02-060, OPM provided to the selection panel a
ranked list of eligible candidates for Vacancy 02-085.  Boone was
listed fifth on the ranked list tied with two other people for
the third highest score.  The Department selected the first two
candidates for promotion.

2.   Pretext

Boone argues that "there exists an issue [of] whether the panel followed, or understood, the Rule of Three or declined to discuss the merits of the candidates below the first two[.]" (Pl.'s Mem. at 42.)  There is some uncertainty as to whether the panel adhered strictly to the rule of three.  Ritchie described the rule of three as requiring the selecting officials to "look at the top three people to consider your selection.  If you decide that you want to hire one of those three, you may hire one of those three and then you can look at the next three people . . . [meaning] look at the two you didn't hire and then the next one on the list."  (Ritchie Dep. at 112-13.)  Ritchie's description differs from the rule of three as described by the vacancy's selection instructions.  The instructions note that the next candidate can be considered when someone declines, but do not indicate how to proceed when a candidate accepts a position. Furthermore, it is unclear how the panel was to proceed when more than one person is tied for the same score on the certificate.

The defendant asserts that the panel selected the two highest-ranked applicants, but the defendant does not affirmatively state whether the panel considered Boone.  The record does support Boone's contention that she was considered. (Pl.'s Mem., Ex. 4 at 0202 ("We did work our way down the list to Ms. Boone.").)  But, she does not show how the panel's

consideration of her candidacy or the use of Ritchie's
interpretation of the rule reflect a discriminatory motive.  See
Fischbach, 86 F.3d at 1183 (stating that "[a]n employer's failure
'to follow its own regulations and procedures, alone, may not be
sufficient to support' the conclusion that its explanation for
the challenged employment action is pretextual" (quoting Johnson
v. Lehman, 679 F.2d 918, 922 (D.C. Cir. 1982))); Kennedy v. D.C.
Gov't, 519 F. Supp. 2d 50, 63 (D.D.C. 2007) (noting that a poor
selection process is insufficient evidence absent "demonstrably
discriminatory motive" and a court evaluating an employment
decision in hindsight "must respect the employer's unfettered
discretion to choose among qualified candidates" (quoting
Fischback, 86 F.3d at 1183) (internal quotation marks omitted)).
The irregularities in the process even if proven must indicate a
discriminatory motive.  See Hamilton v. Paulson, 542 F. Supp. 2d
37, 48 (D.D.C. 2008) (stating that a panel member's
misunderstanding of the nature of the position or lack of
expertise failed to raise an inference of bias because the
irregularities may have indicated error or incompetence, but not
discrimination); Butler v. Ashcroft, 293 F. Supp. 2d 74, 79-80
(D.D.C. 2003).  Furthermore, Boone does not argue that she was
substantially more qualified than either of the two promoted
candidates.  Absent additional stronger evidence, the fact that
the panel may not have followed the Department's policy precisely

- 23 -

is insufficient here to support an inference of discriminatory
motive.

## CONCLUSION

Because Boone has presented evidence reflecting that she
contacted the Department's EEO counselor within forty-five days,
Boone has shown that she initiated contact as was required.  She
has also presented evidence from which a reasonable jury could
conclude that the Department's proffered legitimate non-
discriminatory reasons for not promoting her for Vacancy 02-060
were a pretext for race discrimination, but she has not presented
evidence from which a reasonable jury could infer gender or age
discrimination.  Additionally, she has not shown that the
Department's legitimate non-discriminatory reasons proffered for
not promoting her for Vacancy 02-085 were a pretext for race,
age, or gender discrimination.  Accordingly, it is hereby

ORDERED that the Department's motion [19] for summary
judgment be, and hereby is, DENIED with respect to Boone's claim
of race discrimination for Vacancy 02-060 and GRANTED in all
other respects.  It is further

ORDERED that Count 3 of the complaint be, and hereby is,
DISMISSED.  It is further

ORDERED that the parties confer and file by February 12,
2010 a joint status report and proposed order reflecting three

- 24 -

mutually agreeable dates on which to hold a scheduling

conference.

SIGNED this 29th day of December, 2009.


                                        _____/s/_____
                                        RICHARD W. ROBERTS
                                        United States District Judge